UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAN STASTNY, RICHARD DAI, AMELIA CAI, AND DAVID CHOI, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 22 C 6852 |
| AADI BHANTI AND DROPMINTS, INC., | ) ) Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) ) |

### AMENDED MEMORANDUM OPINION AND ORDER

The story of this case is one that has been told before: A young entrepreneur pitches a product as something sure to transform an industry; investors flock to get in on the ground floor; and, for one reason or another, the business fails or disappears. Here Defendant Aadi Bhanti sold Plaintiffs on his idea for an online platform that would be the fastest way for creators to verify and sell non-fungible tokens ("NFTs").[1] Plaintiffs invested nearly $600,000 in Bhanti's company, Dropmints, Inc. Before long however, the investors became suspicious. Rumors began to swirl about Bhanti's lavish habits—traveling in private jets and purchasing exotic cars—and Plaintiffs became concerned. After making several unsuccessful attempts to get information from Bhanti about the status of the business, they sued Bhanti and Dropmints alleging fraud, unjust enrichment, and conversion.

---

[1] According to Wikipedia, an NFT, or non-fungible token, "is a unique digital identifier that is recorded on a blockchain and is used to certify ownership and authenticity. It cannot be copied, substituted, or subdivided. The ownership of an NFT is recorded in the blockchain and can be transferred by the owner, allowing NFTs to be sold and traded. NFTs can be created by anybody and require few or no coding skills to create. NFTs typically contain references to digital files such as artworks, photos, videos, and audio. Because NFTs are uniquely identifiable, they differ from cryptocurrencies, which are fungible." Non-fungible tokens, WIKIPEDIA, https://en.wikipedia.org/wiki/Non-fungible_token (last visited Sept, 30, 2023); *see also* Kevin Roose, *What are NFTs?*, N.Y. TIMES (Mar. 18, 2022), https://www.nytimes.com/interactive/2022/03/18/technology/nft-guide.html (last visited Sept. 30, 2023)

In a departure from the standard plot, Bhanti responded three days later; by email, he offered to pay Plaintiffs everything they sought in their complaint in order to settle the case. Plaintiffs accepted. But Bhanti never followed through and never paid Plaintiffs. Plaintiffs have filed an amended complaint adding a claim for breach of settlement agreement against Bhanti—while still maintaining their claims of fraud, unjust enrichment and conversion. Defendants have moved to dismiss the complaint for failure to state a claim. FED. R. CIV. P. 12(b)(6). For reasons explained here, the motion is denied.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *O'Boyle v. Real Time Resolutions, Inc.*, 910 F.3d 338, 342 (7th Cir. 2018) (quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In ruling on such a motion, the court accepts the truth of all well-pleaded factual allegations and draws all reasonable inferences in plaintiff's favor of the plaintiff. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012). Typically, a court considers only the allegations in the four corners of the complaint in ruling on a motion to dismiss. *Kuebler v. Vectren Corp.*, 412 F. Supp. 3d 1000, 1003 (S.D. Ind. 2019), *aff'd*, 13 F.4th 631 (7th Cir. 2021) (citing *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018)). The court may, however, consider materials outside the plaintiff's complaint if they are referred to in the complaint and central to it. *Id.* (citing *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)); *see also Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (collecting cases) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").

## BACKGROUND

Sources on the Internet hype Defendant Aadi Bhanti as an "innovation machine" at the forefront of the digital asset space. (Supplemental Complaint ("Suppl. Compl.") [16] ¶ 17.)

According to one such source,[2] Mr. Bhanti started a "social media agency" at the age of fifteen and went on to launch two startups—one, a meat distributor called "Source to Table," and a second described as a talent agency for online influencers called "InfluenceX." (*Id.* ¶ 18.) Bhanti's personal social media accounts on Facebook, Twitter, and YouTube also touted his various business successes. (*Id.* ¶ 19.)

Whether any of the breathless enthusiasm was deserved is not clear. What is clear is that Bhanti was successful in attracting investors, including Plaintiffs in this case. In April 2021, he began promoting a new business on the Twitter platform called "Dropmints, Inc." (*Id.* ¶ 20.) The online posts describe Dropmints as an NFT minting platform--with the ability to verify NFTs with a single click and no fees in "between 30 and 60 seconds." (*Id.* ¶ 28.) In a post from August 2021, Bhanti announced that Dropmints was slated to "launch publicly on November 1st." (*Id.* ¶ 22.) In September, Bhanti posted the news that his company had "already acquired a number of [online content] creators with a cumulative following larger than any other NFT platform that exists today." (*Id.* ¶ 29.) Dropmints was incorporated in Delaware in April of 2021. (*Id.* ¶ 21.)

Plaintiffs Jan Stastny, Richard Dai, Amelia Cai, and David Choi are a group of investors who pool their funds to invest jointly in businesses related to digital assets—for example, blockchain and crypto ventures. (*Id.* ¶ 27.) Plaintiffs were introduced to Bhanti by a mutual acquaintance and set up a meeting to discuss investing in the company. (*Id.* ¶ 30.) Their first meeting took place on the messaging application "Telegram" and included just two participants: Plaintiff Cai and Defendant Bhanti. (*Id.*) During this meeting, Bhanti solicited an investment from Cai's group and provided Cai with a 2-page document titled "Dropmints Investment Memo." (*Id.*) The memo has three sections--one identifying the 'Problem" in the NFT market that Dropmints would address, one identifying the "Solution" that Dropmints would develop, and a third

---

[2] *See* John Romeo, *The Story of Aadi Bhanti- From High School Student to Innovation Machine*, FUTURE SHARKS (Sept. 23, 2020), https://futuresharks.com/the-story-of-aadi-bhanti-from-high-school-student-to-innovation-machine/ (last visited Sept. 30, 2023).

highlighting the "Progress" Dropmints claimed to have already made. (Ex. B to Defendants' Motion to Dismiss Supplemental Complaint ("Defs.' Mot. To Dismiss Supp. Compl.") [32–2] at 1–2.)

The "Solution" section of the memo, which fills most of the two-page document, begins by announcing that Dropmints "is building the fastest way for creators to mint and sell NFTs" and that Dropmints "will be simpler than listing merchandise items on Shopify, faster than uploading an Instagram post, and completely free." (*Id.* at 1.) The investment memo goes on to state that "Dropmints provides simple, jargon-free transactions that are still completely on chain and non-custodial" and that "[e]ach Dropmints profile is essentially an NFT wallet." (*Id.* at 2.) The memo also claims that Dropmints' technology makes collecting NFTs simpler and that "[f]ans can double tap the side of their iPhones to use Apple Pay to purchase NFTs or they can use their credit or debit cards." (*Id.*) This section of the memo further adds that the company has "been building a back office team in India with graphic designers, editors, and mixed media specialists." (*Id.*)

The "Progress" section of the memo is much shorter than the "Solution" section, and is quoted in full below:

> It's been an amazing few months at Dropmints.
>
> - Finalizing and adding new creator, agency, and label partnerships. (at **1.5B** combined followers amongst our creator base)
> - Creator Hub Test Complete, view our findings in deck.
> - Team has grown to 13 members in the US, and 6 in India.

(*Id.* (emphasis in original).) The Dropmints Investment Memo also included a link to a document titled "Dropmints: The Big Vision." (Supp. Coml. ¶ 32.) Like the Investment Memo, the "Big Vision" document is just two pages long and broadly describes the ambitions of the company. (*See* Ex. C to Defs.' Mot. To Dismiss Supp. Compl. [32–3].) For example, one part of the document asserts:

> Dropmints is going to be a default global business. We're building the global stack for NFT minting, selling, and purchasing. We're already building the easiest way to interact with the ecosystem, and we're working with some of the largest creators in the US. We plan on using these relationships, as well as working with our

> current partners on building core groups of creators in India, Nigeria, Ghana, and Hungary to build a robust NFT presence there.

(*Id.* at 2.) In addition to providing Cai with the Investment Memo and a link to the Big Vision document, Bhanti also gave Cai a mock-up of what the Dropmints app would look like. (Supp. Compl. ¶ 34.)

Cai relayed these materials to her fellow investors. After reviewing the documents Bhanti had provided and information publicly available about him (chiefly his social media history), the Plaintiffs chose to pool funds and invest in Dropmints. (*Id.* ¶¶ 35, 36.) Plaintiffs made their initial investment on October 1, 2021, in the amount of $80,000, a transaction documented in a "Simple Agreement for Future Tokens or Equity" ("SAFTE") executed between Plaintiff Stastny and Dropmints. (*Id.* ¶ 36; *See* Ex. A to Defs.' Mot. To Dismiss Supp. Compl. [32–1] (hereinafter "SAFTE Contracts") at 1.) The SAFTE, drafted by attorneys for Bhanti at Katten Muchin Rosenman LLP ("Katten"), is nine pages long and sets forth the parties' rights and obligations; it includes various boilerplate provisions, a few of which are particularly relevant here. (Supp. Compl. ¶ 23.) Paragraph 5(g) of the SAFTE establishes that the laws of the State of Delaware govern the SAFTE. (SAFTE Contacts at 7.) Under the heading "Investor Representations," Paragraph 4(b) of the SAFTE confirms that the investor signing the agreement is "an accredited investor as such a term is defined in Rule 501 of Regulation D under the Securities Act" and that the investor "is capable of evaluating the merits and risks of such investment . . . and is able to bear the economic risk of such investment." (*Id.* at 6.) The SAFTE also contains a no-reliance clause embedded in Paragraph 4(c):

> Except as expressly set forth herein, the Investor acknowledges that it has not relied upon any representation or warranty made by or on behalf of the Company or the Token Issuer.[3]

---

[3] The SAFTE defines "Token Issuer" as "the foundation or non-profit entity that has entered or will enter into a services contract, agreement, relationship, understanding or arrangement with the Company or any of its affiliates to develop a blockchain protocol and the associated ecosystem (the "Token Ecosystem"), which Token Ecosystem will adopt the Tokens for use in various transactions in the ecosystem. The Token Issuer shall include the Company

(*Id.* at 6.) Plaintiff Stastny and Defendant Bhanti are the only signatories to this document, but the complaint alleges that the four Plaintiffs "acted together as an informal partnership" in their investment in Dropmints. (*Id.* at 9; Supp. Compl. ¶ 53.) It is unclear from the complaint whether any attorneys represented Stastny or any of the other Plaintiffs in connection with the negotiation or execution of SAFTE.

A few weeks after Plaintiffs' initial investment in Dropmints, Bhanti messaged Plaintiffs to notify them that he was in Dubai and would be doing "an exclusive collection with the royal family." (*Id.* ¶ 37.) He later invited Plaintiffs to visit Dropmints' office, which Bhanti claimed was in New York City, but that visit never occurred due to scheduling conflicts. (*Id.* ¶¶ 38, 39.) Plaintiffs remained committed to Bhanti's business, however, and on December 8, 2021, they again pooled their money to make a second investment in Dropmints. (*Id.* ¶ 41.) This time, the Plaintiffs invested $163,000 and, as before, Plaintiff Stastny executed the transfer in a second SAFTE on behalf of all four investors. (*Id.*) Apart from reflecting the different investment amounts, the second SAFTE was identical to the first. (*See generally* SAFTE Contracts at 1–18.)

The parties' optimism surrounding Dropmints continued for several months. In early February 2022, Bhanti shared with Plaintiffs the news that Dropmints had "just locked in" the popular social media personality Jake Paul, and that Logan Paul and Mike Majlak (also social media personalities) were "coming on board" as well.[4] (Supp. Compl. ¶¶ 42, 43.) Bhanti also

---

and its affiliates if the Tokens are directly issued in lieu of an issuance from the foundation or non-profit entity." (Ex. A to Defs.' Mot. To Dismiss Supp. Compl. at 5.)

[4]     Jake and Logan Paul, brothers, are internet content creators, each with over twenty million subscribers on their YouTube pages. The two brothers also recently began careers in prize fighting. Jake Paul, WIKIPEDIA, https://en.wikipedia.org/wiki/Jake_Paul (last visited Sept. 30, 2023); Logan Paul, WIKIPEDIA, https://en.wikipedia.org/wiki/Logan_Paul (last visited Sept. 30, 2023). Mike Majlak is also an internet content creator and has just under three million subscribers on his YouTube Page. Mike Majlak Vlogs, YOUTUBE, https://www.youtube.com/@MikeMajlakVlogs (last visited Sept. 30, 2023).

touted that Dropmints had "[b]rought on a top-tier CMO" who was named the "#1 gen-Z expert[5] by Forbes," and was "the youngest Adweek Young Influential." (*Id.* ¶ 43.) Continuing through the first two weeks in February, Bhanti delivered more good news, including that Dropmints had launched its "creator hub" (*id.* ¶ 42); had secured a partnership with Get Engaged, the "largest music marketing agency in the country" (*id.* ¶ 45); was "bringing in another [$]6.5[M] this round" and that it "can allocate $350k!"[6] (*id.* ¶ 46); had just "pushed its new landing page live" in a "push to get username reservations" (*id.* ¶ 47); could "be profitable at scale by EOY;" and would be "doing a private [investment] round prior to our marketplace launch on March 1st" (*id.* ¶ 44).

In the wake of all this good news, Plaintiffs pooled their money for a third time and, on February 11, 2022, invested another $350,000 in Dropmints. (*Id.* ¶ 51.) On behalf of all four Plaintiffs, Plaintiff Stastny again executed the transfer through a SAFTE, which was identical to the previous two SAFTE documents in its pertinent provisions. (*Id.*; *see generally* SAFTE Contracts at 1–27.) These three investment transactions totaled $593,000. (*Id.* ¶ 52.)

But things began to sour. Within the next several months, Dropmints' progress reports stopped coming and Bhanti became increasingly difficult to contact—he missed at least five scheduled calls.[7] (*See id.* ¶¶ 81–88.) After missing a scheduled call with Plaintiffs on March 20, 2022, Bhanti wrote to them, stating:

> Hey. I'm actually not avoiding you guy[s] . . . I was in a different call with our attorneys. I try to get with them on weekends. I have no intention of dodging you guys and not being transparent. I deeply apologize. No more excuses, only punctuality and action. Terrible look at the worst time.

(*Id.* ¶ 85.) Plaintiff Dai had become suspicious. He responded to Bhanti by saying:

> [W]e have heard that you've been misappropriating assets in the company and spending investor funds on private jets and luxury car rentals, completely

---

[5] The Supplemental Complaint does not specify the identity of this "gen-Z expert."

[6] To whom or what these funds would be "allocated" is unstated. (*Id.* ¶ 46.)

[7] The Supplemental Complaint references a missed "scheduled status call" on March 16, 2022; two missed calls on March 18, 2022; a missed call on March 20, 2022; and a missed call on March 21, 2022.

7

> inappropriate. Not only that, I do have my suspicion on our funds being used to payback other investors due to you saying you needed funding immediately and also in [crypto currency] . . .

(*Id.* ¶ 86.) Specifically, Plaintiffs were referring to reports from what they deem "knowledgeable and credible sources" that in January and February 2021, Bhanti had spent more than $225,000 on lavish stays in Hollywood Hills of Los Angeles. (*Id.* ¶¶ 59–68.) During these trips, Bhanti reportedly stayed at multiple luxury home rentals and rented exotic cars including Lamborghinis, a McLaren 720, and a Mercedes Benz G63. (*Id.*) Plaintiffs had also heard rumors from unidentified sources that Bhanti had been chartering private jets for his travel and inviting an entourage of "Instagram models" to join him on his trips—incurring costs approaching $300,000. (*Id.* ¶¶ 69–78.) In response to Plaintiff Dai's allegations of misappropriation of funds, Bhanti replied:

> Understood, will get things moving on this. I was hoping we could have a conversation, but I myself ruined that opportunity. I'm not sure what or who you guys think I am, but a lot of what's been going on is false / not my fault. But mistakes have been made. Let me know if there is any way we can discuss one last time tomorrow afternoon. * * * . This is the final chance I'm asking for, if I miss that call- feel free to go ballistic and do your thing. I swear on my own life that I will be there and ready to go.

(*Id.* ¶ 87.) The parties scheduled a call for the next day, but Bhanti again missed this meeting. (*Id.* ¶ 88.) Bhanti excused his absence by claiming—with what Plaintiffs call "zero evidence"— that friends of the rap artist Lil Tjay had robbed him earlier in the day. (*Id.*)

Later that month, Bhanti sent Plaintiffs a document via DocuSign titled "Timeline of Investor Buyout and Funds Return"; this document purported to offer Dropmints' investors an opportunity to "receive a break even exit" whereby "within three weeks from receiving this document, investors will have their complete and total investment amounts back from Dropmints Inc." (*Id.* ¶ 89.) The complaint does not make clear what prompted Bhanti to send this document to Plaintiffs, nor does it explain whether Plaintiffs agreed to sign it. Plaintiffs do allege that Bhanti did not in fact return any funds. (*Id.* ¶ 90.) Then in May 2022, Bhanti again proposed to refund Plaintiffs' investment through a three-month installment plan and added that "[y]ou can put this on

8

paper and it will be signed by me and family." (*Id.* ¶ 91.) Evidently in response, Plaintiffs contacted a lawyer who drafted a repayment agreement and sent it to Bhanti, but Bhanti failed to sign the agreement. (*Id.* ¶ 94.)

On September 9, 2022, Plaintiffs sued Defendants Bhanti and Dropmints, Inc. in federal court in Delaware. (Complaint [1].) Three days later, on September 12, 2022, Bhanti reached out to Plaintiffs and stated:

> I'm willing to pay the full amount. This Twitter stuff needs to stop. With an amount of interest as well. As well as lawyer fees. Everything you request in the 'prayer' [for relief]. I'll e-mail your lawyers now.

(Supp. Compl. ¶ 114.) Later that same day, Bhanti also emailed Plaintiffs' attorney directly (presumably the lawyers who filed this case, though that is not clear from the complaint), stating that he had become aware of the lawsuit on Twitter and proposing, "[l]et's avoid this. I'm willing to settle." (*Id.* ¶ 115.) Bhanti followed up by calling Plaintiffs' counsel, but Plaintiff's attorney told Bhanti he could not communicate with Bhanti directly if Bhanti himself were represented by counsel. (*Id.* ¶ 117.) There was no discussion of the settlement offer or the dispute underlying the litigation in that call. (*Id.*)

Even before filing the suit, Plaintiff's counsel was aware that Defendant Dropmints was represented by Attorney David Stagman, because the two lawyers had engaged in pre-suit settlement discussions. (*Id.* ¶ 116.) On multiple occasions, however, Mr. Stagman made clear that he was not representing Bhanti in his individual capacity. (*Id.*) The morning after Bhanti emailed his proposal to Plaintiffs' counsel, Plaintiffs' counsel replied, with a copy to Mr. Stagman:

> Mr. Bhanti,
>
> As I stated to you when you called me last night, I cannot communicate with you if you are represented by counsel. You told me last night that you are represented by counsel, although Mr. Stagman previously advised us that he does not represent you individually.
>
> If you are indeed represented by counsel, please provide your counsel's contact information.

(*Id.* ¶ 118.) Bhanti responded:

9

> Contact information is the same as it has always been. I am represented. I don't remember that ever being said. David Stagman is on this email thread as well!

(Ex. D to Defs.' Mot. To Dismiss Supp. Compl. [32-4].) Mr. Stagman himself also replied to the email by stating "[w]e are counsel for Dropmints and currently evaluating representing Mr. Bhanti in this matter." (Supp. Compl. ¶ 119.) Frustrated, Plaintiffs' counsel responded: "If you don't advise us tomorrow that you are representing Mr. Bhanti, we will proceed to deal with him directly unless and until counsel contacts us on his behalf"—to which Mr. Stagman replied, confirming now that he was acting only "as counsel for Dropmints." (*Id.* ¶ 120.) The following day, September 14, Mr. Stagman again communicated that he was acting "as counsel for Dropmints." (*Id.* ¶ 121.)

At this point, Plaintiff's counsel was willing to negotiate with Bhanti directly, and did so. He emailed Bhanti, accepting what Plaintiffs perceived as Bhanti's earlier offer to settle:

> Mr. Bhanti,
>
> We understand from our communications with Mr. Stagman that he does not represent you, leaving us free to communicate with you directly.
>
> We further understand that you made a settlement proposal to our clients on Monday night, specifically that you would pay the full $593,000 demanded, plus interest and attorneys' fees. Our clients accept that proposal.
>
> Please send $665,383.58 in USDC (reflecting the full $593,000 amount, 5% simple interest of $19,846.58 on the amounts received by you, and the $52,537 in legal fees incurred by our clients through yesterday) to the wallet address [xxx]1328.
>
> Alternatively, you may send that amount of cash to our attorney escrow account at the wire instructions below [inserting wire instructions].
>
> Upon receipt of that transfer, our clients will withdraw the lawsuit promptly with prejudice, and this matter will be ended.

(*Id.* ¶¶ 122, 123.) The complaint does not say whether or how Bhanti replied to this email, but Plaintiffs allege that he has not made any payment pursuant to the alleged settlement agreement. (*Id.* ¶ 124.) On December 6, 2022, the case was transferred to this District. [22.] On January 20, 2023, Mr. Stagman filed an appearance as counsel for both Defendants Dropmints and Bhanti in this case. [31.]

In the meantime, on November 7, 2022, Plaintiffs filed their Supplemental Complaint against Defendants Aadi Bhanti and Dropmints, Inc. [16.] Count I of the complaint alleges fraud: Plaintiffs claim that Defendants falsely represented that Bhanti was the founder of a legitimate company, before and after Plaintiffs invested their money. (*Id.* ¶ 97.) Plaintiffs allege that the three SAFTEs were merely instruments by which Defendant Bhanti committed fraud. (*Id.* ¶ 97.) Plaintiffs allege, further, that Bhanti induced them to invest in Dropmints by falsely claiming, at various times either privately or publicly, that Dropmints was "already building the easiest way to interact with the [NFT] ecosystem" and "working with some of the largest creators in the US" (*id.* ¶¶ 32, 33); that Defendant Bhanti was conducting business meetings with the royal family of Dubai (*id.* ¶ 37); and that Dropmints had a functioning "Launch App" capable of collecting "username reservations" (*id.* ¶ 50). Additionally, Plaintiffs allege, on information and belief, that Defendant Bhanti falsely represented, at various times either privately or publicly, that he had built an NFT platform capable of minting NFTs in 30 to 60 seconds (*id.* ¶ 28); that Dropmints had already acquired several prominent creators including Jake Paul (*id.* ¶ 29, 42); that the company was "building a back office team in India with graphic designers, editors, and mixed media specialists" (*id.* ¶ 30); that Dropmints had a "binding creator base" with a combined 1.5 billion followers (*id.* ¶ 31); and that Dropmints had an office in New York City. (*Id*. ¶ 40). According to Plaintiffs, none of those things are true.

In Count II of the Supplemental Complaint, Plaintiffs allege unjust enrichment against both Defendants, asserting that Defendants unjustly enriched themselves by using Plaintiffs' investments to fund Bhanti's lavish style. (*Id.* ¶¶ 104–08.) In Count III, Plaintiffs bring a similar conversion claim against Defendant Bhanti. (*Id.* ¶¶ 109–112.) Finally, Count IV alleges that Defendant Bhanti breached the settlement agreement that the parties entered into on September 14, 2022, when Plaintiffs accepted Bhanti's settlement offer. (*Id.* ¶¶ 113–129.)

Defendants have moved to dismiss each count of Plaintiffs' Supplemental Complaint under Rule 12(b)(6). Defendants argue that Plaintiffs' fraud, unjust enrichment, and conversion

claims must fail because they are precluded by the "non-representation" clauses in the SAFTE's and, alternatively, that Plaintiffs have failed to adequately plead fraud under Rule 9(b). Defendants attack Plaintiffs' breach of settlement agreement claim on two fronts.[8] First, Defendants argue that Plaintiffs have not alleged an enforceable contract because Bhanti's settlement offer was contingent upon the condition that "[t]his Twitter stuff needs to stop" and Plaintiffs have not pleaded that they met this requirement. Additionally, Defendants argue that Plaintiffs' breach of settlement agreement claim must be dismissed because Plaintiffs' Counsel allegedly violated Rule 4.2 New York Rules of Professional Ethics by communicating with Defendant Bhanti directly.

## DISCUSSION

At the outset, the court notes that if Plaintiffs ultimately succeed on Count IV, then the remainder of the action is moot, at least with respect to their claims against Defendant Bhanti individually. In other words, if the parties settled this matter on September 14, the settlement agreement is enforceable and Plaintiffs are barred from bringing their fraud, unjust enrichment, and conversion claims against Bhanti. Therefore, the court begins here: Have Plaintiffs adequately stated a claim for breach of settlement agreement?

**I.     Breach of Settlement Agreement**

The formation, construction, and enforcement of settlement agreements is governed by state contract law. *Beverly v. Abbott Lab's.*, 817 F.3d 328, 333 (7th Cir. 2016) (citations omitted). Under Illinois law, the existence of a valid and enforceable contract requires mutual assent to all material terms. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016) (citations omitted). The mutual assent inquiry measures the parties' objective intent, "considering their words and conduct but not their subjective beliefs." *TRT Transp., Inc. v. Aksoy*, 506 F. App'x 511,

---

[8] Defendants' motion to dismiss refers to the settlement agreement as an "oral" agreement. However, the Plaintiffs' Supplemental Complaint clearly describes a written agreement in the form of an initial email from Defendant Bhanti making the offer to settle and then another email from Plaintiffs accepting the offer.

513 (7th Cir. 2013) (citations omitted). An agreement's terms are sufficiently certain when they "enable a court to ascertain what the parties agreed to do." *Beverly*, 817 F.3d at 333 (citing *K4 Enters., Inc. v. Grater, Inc.*, 394 Ill.App.3d 307, 313, 914 N.E. 2d 617, 624 (1st Dist. 2009) (citation omitted)).

To satisfy federal pleading requirements, Plaintiffs need only set forth "a short and plain statement of the claim" showing that they are entitled to relief. FED. R. CIV. P. 8(a)(2). Plaintiffs have done so here, alleging that on September 12, 2022, Defendant Bhanti emailed Plaintiffs a settlement offer with definite terms (Supp. Compl. ¶14.); that two days later, Plaintiffs emailed Defendant Bhanti accepting his offer to settle (*id.* ¶ 123.); and that Defendant Bhanti has breached this agreement by failing to pay Plaintiffs the settlement amount (*id.* ¶¶ 128,129). These allegations state a plausible claim for breach of settlement agreement.

Defendant Bhanti now contends that there was no enforceable settlement agreement between the parties because his offer to settle was allegedly contingent on the condition that "[t]his Twitter stuff needs to stop." (Mot. To Dismiss Supp. Compl. at 16.) Defendant does not elaborate on what exactly this pre-condition entailed, nor even that Plaintiffs failed to meet it. In support, Bhanti cites to *Fleming v. Chicago Sch. of Pro. Psychology*, No. 15 C 9036, 2017 WL 4310536, at *5 (N.D. Ill. Sept. 28, 2017). In *Flemming*, a student alleged she had entered into an oral agreement with the dean after she was dismissed from the school for poor academic performance. *Id.* Specifically, the plaintiff alleged that the dean agreed that if readmitted to the school, she would be permitted to complete her studies at the school as a "thesis student" rather than as a "clinical student," and that the dean breached this agreement when she was denied readmission. *Id.* Dismissing plaintiff's breach-of-contract claim, the court noted that at the time plaintiff made this alleged agreement to proceed as a "thesis student," she was aware that the dean was reviewing her application for readmission; indeed, the dean had cautioned plaintiff in emails not to solidify any plans for thesis-track education because he was still reviewing plaintiff's

13

appeal of her dismissal. *Id.* It was, in the court's view, "not plausible that reinstatement was not a contingent circumstance" to the oral contract. *Id.*

*Fleming* is distinguishable from this case. First, it is not at all clear that the reference to the need for "this Twitter stuff . . . to stop" constitutes a contingent condition of the parties' agreement. But assuming that it does, the Supplemental Complaint alleges that Plaintiffs accepted Defendants' proposal in full and there is no allegation that Plaintiffs failed to meet that condition. Plaintiffs need not "anticipate affirmative defenses to survive a motion to dismiss" unless "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). The Supplemental Complaint in this case provides no support for Defendant's affirmative defense.

Defendant Bhanti also urges that the settlement agreement is void because Plaintiffs' Counsel communicated with Bhanti despite knowing that he was represented by counsel, in violation of Rule 4.2 of the New York Rules of Professional Ethics.[9] The record defeats this argument. Plaintiffs allege—and the correspondence reflects—that Plaintiffs' counsel understood that Defendant Bhanti was *not* represented by counsel when the parties entered into the settlement agreement. (Supp. Compl. ¶ 127.) Before communicating substantively with Bhanti, Plaintiffs' counsel took appropriate steps to confirm this. And, as alleged in the Supplemental Complaint, Mr. Stagman, who is presently counsel for both Dropmints and Bhanti, repeatedly confirmed in writing that he was not representing Defendant Bhanti while the settlement communications were ongoing. (*Id.* ¶¶ 119, 121, 22, 125.) At the pleading stage, the court accepts Plaintiffs' allegation that Bhanti was not represented by counsel while the settlement discussions took place and that Plaintiffs' counsel operated under this belief.

---

[9] Attorneys "of counsel" to Plaintiffs at the time of filing of the original complaint have a New York address. (Compl. [1], at 22.) The language of Rule 4.2 states "a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law." N.Y. R. Prof'l Conduct 4.2.

14

*Niesig v. Team I*, 76 N.Y.2d 363, 369-375, 558 N.E.2d 1030, 1032–36 (1990), cited by Bhanti, does not change the court's conclusion. *Niesig* recognizes that Rule 4.2 prohibits lawyers from communicating directly with a party known to have counsel, and elaborated that "party" includes corporate employees whose acts or omissions in a matter are binding on a corporation. *Id.* at 374, 558 N.E.2d at 1035. Bhanti would appear to fall into that category; but in this case, Plaintiffs' counsel was unquestionably sensitive to the concern. Counsel communicated directly with Bhanti only after Dropmints' counsel communicated that his role as counsel for Dropmints did *not* include representation of its CEO.

Bhanti's motion to dismiss Count IV is denied.

**II.    Fraud**

Before evaluating Defendants' attack on Plaintiffs' fraudulent inducement claims, the court considers the question of what substantive law applies. A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits—in this case, Illinois. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). For choice of law purposes, a fraudulent inducement claim is dependent upon the contract and, therefore, subject to any choice-of-law contract provisions if the allegedly fraudulent statements were made in the contract. *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 306 (7th Cir. 2018) (citing *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F.Supp.2d 857, 862 (N.D. Ill. 2002). When examining whether a tort claim is contract-dependent, "courts examine whether the action alleges a wrong based upon interpretation and construction of the contract, or whether the claim alleges elements constituting an independent tort." *Id.* (citation omitted). Here, the alleged fraud is not dependant upon interpretation of construction of the SAFTEs. Plaintiffs are not alleging that any provision of the SAFTEs fraudulently induced them to enter into the contract; they identify a myriad of other

15

representations and acts that they claim were false or misleading. Accordingly, we will apply Illinois state tort law.[10]

The elements of common law fraud under Illinois law are "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Squires-Cannon v. Forest Preserve Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018) (quoting *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 495, 675 N.E.2d 584, 591 (1996)). Additionally, the Federal Rules of Civil Procedure require that a party alleging fraud "must state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). In the Seventh Circuit, this means that the plaintiff "ordinarily must describe the who, what, when, where, and how of the fraud—the first paragraph of any newspaper story." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (internal quotation marks and citation omitted). Courts in this Circuit nevertheless recognize that the particularity formulation is not "overly rigid" and that the requirements of Rule 9(b) "must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim." *Id.*; *Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 897 (N.D. Ill. 2009) (quoting *Corley v. Rosewood Care Ctr.*, 142 F.3d 1041, 1051 (7th Cir. 1998)).

Defendants move to dismiss Plaintiffs' fraud claim on two grounds. First, Defendants argue that Plaintiffs' fraud claim is barred by the no-reliance clause contained in each of the three SAFTEs. Second, Defendants argue that Plaintiffs failed to plead fraud with particularity. Both of these arguments fall short.

No-reliance clauses serve the purpose of "head[ing] off a suit for fraud' [by] removing the reliance element necessary to state such a claim." *In re Kindra Lake Towing, L.P.*, No. 15 C 3174,

---

[10] The parties themselves have been inconsistent as to whether Illinois or Delaware law is applicable law and point to each state's law at various points in their briefing. If there are differences in the substantive law on these issues, the parties are free to submit further briefing on the matter.

16

2016 WL 3227303, at *2 (N.D. Ill. June 13, 2016) (quoting *Extra Equipamentos E Exportacao Ltda v. Case Corp.*, 541 F.3d 719, 724, 733 (7th Cir. 2008)). Courts have acknowledged the important role these clauses play in ensuring that the transaction and any litigation arising from it is based on the parties' writings rather than defective memories. *Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000). At the same time, courts have also noted that these clauses are often called "'big boy' clauses (as in 'we're big boys and can look after ourselves')" and that when they are entered into by someone who is not a "big boy," "there can be a problem." *Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 724 (7th Cir. 2008). Thus, before such a clause can be enforced, courts inquire into the circumstances surrounding the execution of the document to ensure that the signatory knew what he was getting into. *Id.*

The court finds it is inappropriate to dismiss Plaintiffs' fraud claims at this stage based on the no-reliance clause. Specifically, it is premature to rule on whether Plaintiffs fully understood the referenced clause to bar any prospective fraud claim. Whether Plaintiffs asked a lawyer to review the SAFTEs before investing is not clear, but it is clear that a law firm drafted the SAFTE for Defendants. *See id.* ("there can be problem" if someone who signs a no-reliance clause is "not even represented by counsel"). The fact that the no-reliance clause contained in the SAFTE was a single sentence embedded within a larger paragraph underscores the concern. Simply put, the court is not prepared, without a more developed record, to conclude that the no reliance clause is enforceable, and declines to dismiss Plaintiffs' claim on this basis.

Defendants also contend that Plaintiffs have not pleaded fraud with particularity, but the court disagrees. Plaintiffs' Supplemental Complaint spells out the "who, what, when, where, and how" of Defendants' fraudulent representations. (*See generally* Supp. Compl. ¶¶ 27–58.) For example, on October 20, 2021, Bhanti falsely represented that he was creating "an exclusive collection with the royal family of Dubai," prompting Plaintiffs to make their second investment in Dropmints. (*Id.* ¶¶ 37, 41.) In February 2022, Bhanti falsely represented to Plaintiffs that the "Launch App" for Dropmints had been released; shortly afterwards, Plaintiffs made their third and

17

largest investment. (*Id.* ¶¶ 47, 50, 51.) The complaint is replete with other alleged false statements and sufficient detail about when and how they were made. Plaintiffs have met their pleading requirements.

### III. Conversion and Unjust Enrichment

Finally, Defendants challenge Plaintiff's unjust enrichment and conversion claims, but their arguments warrant no lengthy discussion: First, the SAFTE agreement does not preclude these claims at the pleading stage for reasons already discussed. Defendants also argue that the tort claims fail to the extent they are predicated on Plaintiffs' fraud claims. But the court has concluded the fraud claims survive this motion, and Defendants have offered no other arguments for dismissal.

### **CONCLUSION**

For the reasons described above, Defendant's motion to dismiss [32] is denied. Defendants are directed to file their answer on or before October 23, 2023. The parties are encouraged to discuss settlement, and invited to advise the court of their interest in meeting with the Magistrate Judge for this purpose.

ENTER:

Date: October 2, 2023

_____
REBECCA R. PALLMEYER
United States District Judge